BOSTON ELECTRIC COMPANY *vs.* CITY OF CAMBRIDGE.

Middlesex.   November 14, 1894. — February 26, 1895.

Present: FIELD, C. J., ALLEN, HOLMES, KNOWLTON, & BARKER, JJ.

*Contract — Authority of Committee of City Council — Ratification by City.*

A city council by vote authorized its committee on public property to contract "for the erection" of a school building in accordance with the plans and specifications of an architect, the total cost of the building not to exceed a sum named. *Held,* that the committee, having made a single contract with A. for the erection of the whole building, exhausted its authority under the vote, and, in the absence of any further authority conferred upon it, could not bind the city by a contract with B. to furnish electrical appliances for the building not contained in the specifications referred to in the vote.

An officer of a city, who is not authorized to contract for the city, has no authority to ratify in its behalf.

The acceptance and use of a building by a city does not bind it to pay for extra unauthorized work done upon it, although the same is beneficial.

CONTRACT, to recover $250, the balance alleged to be due the plaintiff under a contract to furnish the electrical appliances for a school building in the defendant city.   Trial in the Superior Court, before *Fessenden*, J., who declined to rule, as requested by the defendant, that the plaintiff could not recover; directed the jury to return a verdict for the plaintiff; and, at the request of the parties, reported the case for the determination of this court.   If, upon the facts agreed, the jury would have been justified in finding for the plaintiff, judgment was to be entered upon the verdict; otherwise, judgment was to be entered for the defendant.   The facts appear in the opinion.

*J. C. Sharkey*, for the plaintiff.

*G. A. A. Pevey*, for the defendant.

ALLEN, J.   The claim of the plaintiff in this case is so meritorious that we regret that the rules of law do not allow a recovery of the amount claimed.

The facts stated in the report fail to show authority on the part of the committee on public property to contract the debt sued for.   This committee is stated to be a joint standing committee of the city council, appointed yearly, but its general powers and duties are not shown, further than its name implies.

This of itself does not show authority to incur debts in behalf of the city. We have then to see what special authority the committee had. In the first place, it was authorized by vote of the board of aldermen and the common council to advertise for proposals for building an English high school, in accordance with plans and specifications prepared by Chamberlain and Whidden, architects. This probably was done; at least there is no intimation in the report to the contrary. On July 23, 1889, a vote was passed by the common council and the board of aldermen, ordering " that the committee on public property be authorized to contract for the erection of an English high schoolhouse in accordance with plans and specifications therefor made by Chamberlain and Whidden, architects. The total cost of said schoolhouse not to exceed the sum of two hundred thousand dollars." No other vote or order of the city council or board of aldermen giving authority to the committee in respect to said schoolhouse appears by the records to have been passed. No vote or order was shown making it the duty of the committee to superintend the erection of the building, or giving to it the power to make any change in the plans or specifications prepared by the architects. Their authority was to contract for the erection of the schoolhouse in accordance with the plans and specifications, and there, so far as the terms of the vote go, their authority ended. After the passing of said order, and at a date which is not given in the report, the committee " entered into a written contract with one Giddings in relation to the building of said high schoolhouse, one item of said contract being as follows : ' Include in the estimate the sum of $250 for bells, tubes, and electric lighting.' " We may perhaps assume that this contract was for the erection of the schoolhouse, and that it was in accordance with the plans and specifications made by the architects, and that the item for bells, tubes, and electric lights was included in those specifications. Afterwards, at a meeting held on January 26, 1891, as the report states, the committee requested one Austin, a member of a firm of architects employed on said building, to obtain from various parties proposals for furnishing the electrical light work on the schoolhouse. On November 20, 1890, as stated in the report, — there appears to be some confusion of dates, but it is probably immaterial, — Austin asked the plaintiff to furnish such a propo-

sal, which the plaintiff did, according to specifications furnished by Austin. The cost was to be $384.50. Austin presented this proposal to the committee. At a meeting of the committee held on January 26, 1891, according to its records, " the subject was considered of certain additional requirements in the completion of the new high schoolhouse. . . . Mr. Austin submitted statements in relation to the internal finish of the high school, as follows: Bells and speaking-tubes, $384.50. Credit allowance in specifications, $250. Net, $134.50." Another meeting of the committee was held on March 19, 1891, and there was a discussion among the members as to its authority to accept a bid of over $300, in view of an ordinance of the city providing that no committee authorized to purchase materials or supplies, or to contract for labor to be performed, should have power to expend more than $300 for any one specific purpose, unless specially empowered, etc. Austin's view was that the committee had the authority, and the committee voted to have speaking-tubes at an extra cost of $134.50, and instructed Austin to inform the plaintiff that its bid had been accepted. This was done the next day. The plaintiff thereupon did the work, which, according to the report, " was accepted by the committee, and the building was afterwards accepted by the city." It is not stated in what manner the building was accepted by the city, but, as hereinbefore recited, it is stated that no other vote or order of the city council or board of aldermen appears by the record to have been passed.

Giddings, the original contractor, " did no work whatsoever, and did not offer to do any work, upon the portion of the work contracted for by the plaintiff, or for which the said sum of $250 was set apart in the Giddings contract."

It would thus appear that, at a time which was probably about eighteen months after making the contract with Giddings, the committee on public property assumed to take into consideration certain additional requirements not contained in the specifications of the architects, Chamberlain and Whidden, and not included within the original authority given to the committee. Whether the committee in March, 1891, when it voted to incur this additional expense, and to employ the plaintiff to do this work in the place of Giddings, was composed of the same

persons who constituted the committee in July, 1889, when the committee was authorized to contract for the erection of the schoolhouse, does not appear in the report. Perhaps it is not material. It may be that under the original vote of authority the committee were not limited to making a single contract for the whole work. It may be that they were at liberty to make separate contracts with the mason, the carpenter, the plasterer, the plumber, etc. See *Damon* v. *Granby*, 2 Pick. 345; *Simonds* v. *Heard*, 23 Pick. 120; *Keyes* v. *Westford*, 17 Pick. 273; *Shea* v. *Milford*, 145 Mass. 528. We do not need to determine this question, because apparently the committee executed its authority by making a single contract with Giddings for the erection of the whole building, according to the plans and specifications of the architects. It is conceded by the plaintiff that Giddings's contract was " for the erection of the building." This having been done, its authority under the vote was exhausted. It was not even directed to superintend the erection of the building. Much less had it the authority to add to the specifications which were expressly referred to in the vote ; and we can find in the report nothing to show that any such authority was conferred upon the committee afterwards. It is indeed stated that " there was then a custom which permitted one of two contracting parties to excuse the other from performance of a portion of his contract, and to deduct the value or price of said unperformed portion from the entire contract price, and that the said committee on public property intended to avail themselves of this custom as to the portion of said Giddings's contract referred to " heretofore. If this means that when the city was a contracting party there was a custom which permitted the committee on public property to act in the manner stated, it still falls short of showing that it was a custom for the committee to bind the city by a new contract for a larger sum with a new contractor ; so that, however Giddings might be affected, we do not see how the plaintiff can get any benefit from this custom. The difficulty is that the authority of the committee to bind the city by contract in relation to the schoolhouse was fixed and limited by the vote of July 23, 1889. This authority was executed. We cannot assume that each succeeding committee in successive years could add new features, and contract with A, B, C, and D

to furnish them outside of the specifications referred to in the vote, provided that no one bill exceeded three hundred dollars. The report does not show any other or subsequent authority which was conferred upon the committee in the premises. *Keyes* v. *Westford*, 17 Pick. 273. The plaintiff was bound to ascertain and take notice of the extent and the limitations of the power of the committee to bind the city. *Lowell Five Cents Savings Bank* v. *Winchester*, 8 Allen, 109. Story, Agency, (9th ed.) § 307 *a*. *Davies* v. *New York*, 93 N. Y. 250. *Turney* v. *Bridgeport*, 55 Conn. 412.

There was no sufficient evidence of ratification by the city of the contract with the plaintiff. It is stated that, " when the plaintiff had partly completed the work contracted for, the defendant paid to the plaintiff the sum of $134.50 on account of this contract of $384.50, and received a receipt therefor." This however must be taken in connection with the statement that the records showed no vote or order of the city council or board of aldermen. An officer who was not authorized to contract had no authority to ratify, and no such authority on the part of the city solicitor or other officer was shown, though in court the city solicitor would no doubt have the usual powers of an attorney. *Haskell* v. *New Bedford*, 108 Mass. 208. *Savage* v. *Blanchard*, 148 Mass. 348. And the acceptance and use of the building by the city do not bind it to pay for extra or unauthorized work done upon it, though the same is beneficial. The city could reject and decline to use the building on this ground, and it was not bound to take out such extra or unauthorized work. *Stuart* v. *Cambridge*, 125 Mass. 102. *Hayward* v. *North Bridgewater School District*, 2 Cush. 419. See also, as to work done on roads, *Blanchard* v. *Ayer*, 148 Mass. 174; *Bean* v. *Hyde Park*, 143 Mass. 245; *Clark* v. *Russell*, 116 Mass. 455; *Keyes* v. *Westford*, 17 Pick. 273; *Loker* v. *Brookline*, 13 Pick. 343; and on the general subject, see Dillon, Mun. Corp. (4th ed.) §§ 464–466, and cases cited.

The result is, that upon the facts reported the jury would not have been justified in finding for the plaintiff, and according to the terms of the report the entry must be,

*Judgment for the defendant.*