TOBIN v. TOWN COUNCIL OF TOWN OF CITY OF
SUNDANCE, WYOMING
(Nos. 1768, 1769; Jan. 4, 1933; 17 Pac. (2d) 666)

220

In case numbered 1768, there was a brief for plaintiff and appellant, and also an oral argument by *Mr. James T. McGuckin,* of Sundance, Wyoming. In case numbered 1769, there was a brief and oral argument for plaintiff and respondent by *Mr. James T. McGuckin,* of Sundance, Wyoming.

In case numbered 1768, there was a brief for defendant and respondent by *Mr. Otis Reynolds,* of Sundance, Wyoming, and *Mr. John T. Heffron,* of Deadwood, S. D., and oral argument by *Mr. Reynolds.* In case numbered 1769, there was a brief for defendant and appellant by *Mr. Otis Reynolds,* of Sundance, Wyoming, and *Mr. John T. Heffron,* of Deadwood, S. D., and oral argument by *Mr. Reynolds.*

222

RINER, Justice.

These two cases, before the court by separate direct appeals from a judgment of the District Court of Crook County, are based upon the same record, both plaintiff and defendant in that court being dissatisfied with the result there reached and each asking for a review of the record. The cases can accordingly be disposed of by one opinion. The action which culminated in the judgment thus attacked was instituted below by T. J. Tobin, doing business under the firm name and style of T. J. Tobin Construction Company, as plaintiff, hereinafter generally so referred to, or as the "contractor," against the Town Council of the Town of the City of Sundance, as defendant subsequently so mentioned, or as the "town."

Summarized, plaintiff's petition alleges a written contract between him and the town for the filling, grading, and graveling of certain of the latter's streets, a copy of this agreement dated September 21, 1929, being attached to and made a part of the pleading. Performance of the work thus contracted for is averred in that plaintiff leveled and graded the town's streets, placing thereon as directed, 1442 yards of dirt at the agreed price of 40 cents per yard and 2754.11 tons of gravel, crushed and prepared by the contractor, at the agreed price of $1.87 per ton. The completion of the work by the plaintiff and its acceptance by the defendant is alleged to have occurred on January 23, 1930 when, at a special meeting of the defendant's town council, his account was by it accepted and he was paid the sum of $2740.71 thereon, leaving a balance of $2878.27 due him, after deducting a charge of $118.00 for water furnished by the town. The rejection on November 3, 1930, by the defendant, of a verified claim made by the plaintiff for the balance aforesaid, and a denial by it of all liability for the work and materials furnished, is pleaded. The petition also charges that the actual and reasonable cost of the labor and material thus furnished is the sum

$2878.27 and that the defendant has been unjustly enriched thereby at the expense of plaintiff in said sum, judgment for which, with costs, is prayed.

The written contract aforesaid, after detailing the streets and the portions thereof to be improved, the depth of the gravel to be laid, the prices for dirt and gravel as set out in plaintiff's petition, and the supervision of the work by the defendant's engineer, provided that the work should be paid for "when the work is satisfactorily completed, one-half of the amount due the second party shall be paid in cash, and the said party of the second part shall and does hereby agree to accept the remaining one-half in warrants of the said party of the first part, which said warrants shall be payable not more than one year from date of issue."

This petition was filed November 22, 1930. March 13, 1931, the town filed its answer in substance asserting that the contract relied upon by the plaintiff was void and without force (1) for failure on the part of the town to obey the provisions of Sec. 1774, Wyo. Comp. St. 1920, in that the expense under said agreement exceeded the sum of $200 and the contract was not let to the lowest bidder after advertisement as required by law and no bond with proper sureties was demanded of plaintiff as the law directs; (2) for failure to comply with Sections 1756 and 1757, Wyo. Comp. St. 1920, in that no valid appropriation had been made by the defendant for the improvements attempted to be made under the terms of said contract and they had not been ordered by a four-fifths vote of the defendant's town council. The answer also denied that plaintiff had completed the work called for by the contract, denied that the town approved, ratified and accepted the work done inasmuch as it was, as plaintiff knew, without legal power so to do and disclaimed all indebtedness to the plaintiff. The answer further set forth a counterclaim alleging that the town had paid plaintiff

without authority of. law and illegally the sum of $2,740.71, which he took and received with knowledge of that fact, and that this amount is now due from him to the defendant. The recovery of this sum with interest was prayed as well as the dismissal of plaintiff's action.

Plaintiff's reply denied each and every allegation in the answer which was not an admission of the allegations of plaintiff's petition. It also pleaded in detail several matters which, it is averred, relieved the town of compliance with the statutes referred to in defendant's answer; viz., the inability of the defendant to procure anyone to do the work desired by the town prior to the time of making the contract; the low prices for the work fixed by the contract, said prices representing its actual cost; the existence of an emergency on account of the streets of the town being boggy, deeply rutted and impassable, through excessive rains. The reply further alleged that the work contracted for and performed by plaintiff was on the principal streets of the town, which is a small incorporated village of about 300 inhabitants, and that each of said inhabitants knew of the work being done and the terms of the contract; that no objection was made by any one of them until long after the completion of said work and payment of one-half of the cost to the plaintiff and that the defendant is estopped to deny liability for the work done and material furnished.

Replying to defendant's counterclaim, in addition to reiterating the preceding averments of the reply, it is averred that after the completion of said work by the plaintiff, its acceptance by the town and a part payment on account thereof, as aforesaid, the defendant promised to pay the plaintiff the balance within a short time thereafter, which promise was repudiated by a new town council elected in May 1930; that, although repudiating the obligations of the town, the latter has accepted the benefits of the work done and materials furnished by plaintiff and

has not offered to return same or make compensation therefor and is now estopped to recover back the payment made or to deny liability for the balance claimed by plaintiff to be due. Other matters are pleaded in the reply which will be referred to hereinafter only in case, in our opinion, they affect the disposition of the contentions here urged by the respective parties.

The case was tried to the court without a jury, resulting in findings being made "that the plaintiff should take nothing by his petition and that the same should be dismissed at plaintiff's cost and that the defendant should take nothing by its counterclaim and that the same should be dismissed." A judgment was entered accordingly, the costs of the action being taxed against the plaintiff.

In order to fully understand the pleadings and contentions of the parties, it is proper at this point to refer to certain sections of the state law dealing with the letting of contracts for public improvements by town officials and limiting the appropriations of town money and the expenditures thereof. So much only of the several sections will be quoted as is pertinent to the questions hereinafter discussed.

Sec. 1774, Wyo. Comp. St. 1920 (now Sec. 22-1447, Wyo. Rev. St. 1931) provides in part:

"In all incorporated * * * towns in the state of Wyoming, all contracts for the making of any public improvement, * * * within any such * * * town * * * when the expense thereof shall exceed two hundred dollars, shall be let to the lowest bidder after notice by advertisement containing complete specifications of the number, size, kind and quality of material and service required, for at least three weeks, in a newspaper printed and published in such city or town. And the contract therefor shall be let only to such bidder. Bids submitted for such contract shall be under seal and the notice herein provided for shall recite the place where, and the day and hour when such bid will be received and publicly opened. Every such contract shall be executed by the mayor, or in

his absence or disability, by the president or other presiding officer of the council or board of trustees and by the town or city clerk. The successful bidder shall give such city or town a bond in a penal sum equal to the amount of his bid, with two sureties, for the faithful performance of his contract.   *   *   *''

Sec. 1756, Wyo. Comp. St. 1920 (now Sec. 22-1429, Wyo. Rev. St. 1931) reads:

''The fiscal year of each town organized under the provisions of this chapter, shall commence on the first day of May in each year or at such other time as may be fixed by ordinance. The town council shall, within the last quarter of each fiscal year, pass an ordinance to be termed the annual appropriation bill for the next fiscal year, in which such corporate authorities may appropriate such sum or sums of money as may be deemed necessary to defray all necessary expenses and liabilities of such corporation; and such ordinance shall specify the objects and purposes for which such appropriations are made and the amount appropriated for each object or purpose. No further appropriation shall be made at any other time within such fiscal year, unless the proposition to make each appropriation has been first sanctioned by a majority of the qualified electors of such town, either by a petition signed by them or at a general or special election duly called therefor. Nor shall the total amount appropriated exceed the probable amount of revenue that will be collected during the fiscal year.''

Sec. 1757, Wyo. Comp. St. 1920 (now Sec. 22-1430, Wyo. Rev. St. 1931) is to the following effect:

''Neither the town council nor any officer of the corporation shall add to the corporation expenditures in any one year anything over and above the amount provided for in the annual appropriation bill of that year, except as is herein otherwise specially provided. And no expenditure for an improvement to be paid out of the general fund of the corporation shall exceed in any one year the amount provided for such improvement in the annual appropriation bill; provided, that nothing herein contained

shall prevent the town council from ordering by a four-fifths vote any improvement, the necessity of which is caused by any casualty or accident happening after such annual appropriation is made."

And Sec. 1758, Wyo. Rev. St. 1920 (now Sec. 22-1431, Wyo. Rev. St. 1931) declares that:

"No contract shall be made by the town council or any committee or member thereof, and no expense shall be incurred by any of the officers of the corporation, whether the object of the expenditure shall have been ordered by the town council or not, unless an appropriation shall have been previously made concerning such expense, except as herein otherwise expressly provided."

The substance of the evidence material to a proper disposition of the questions presented for decision will be given in connection with the appropriate discussion of each.

The proof shows and it is conceded upon this record that the contract upon which plaintiff relies was let by the defendant's town council without complying with the requirements of Section 1774, supra. This being so, the question at once arises as to the effect such failure to obey the law shall have upon the contract thus attempted to be made. In II Dillon on Municipal Corporations (5th Ed.) 1197-8, § 801, the author states the rule to be:

"Where the charter or incorporating act requires the officers of the city to award *contracts to the lowest bidder* a contract made in violation of its requirements is illegal; and in an action brought on such contract for the work, the city may plead its illegality in defense; and neither the municipality nor its subordinate officers can make a binding contract for such work except in compliance with the requirements of the law."

So, 44 Corpus Juris 100-1, § 2185, says:

"Where, however, a statute, charter, or ordinance requires public bidding, a contract made in violation or evasion of these requirements, and not within the terms of a special exception or exempting statute, is generally invalid, and imposes no obligation or liability on the corporation."

A comparatively recent comprehensive text discussing the same subject matter is to the same effect, the statement being, "The general rule is that if a contract is within the corporate power of a municipality but the contract is entered into without observing certain mandatory legal requirements specifically regulating the mode in which it is to be exercised, there can be no recovery thereunder." 3 McQuillin, Municipal Corporations (2nd Ed.), § 1283, p. 849. See also, 19 R. C. L. 1068, § 356. The views expressed by the several authorities quoted from above are supported by such extensive lists of cited cases that they must be regarded as delineating the settled current of decision.

Provisions such as are contained in Sec. 1774, supra, from the standpoint of both reason and authority alike, may not be regarded lightly and as merely formal and unimportant matters. They appear in those statutes generally, throughout the several states of the Union, which control the action of state and municipal officers who are charged with the duty of expending public funds for necessary improvements, material, services, and the like. Unquestionably, they were devised and are so inserted to prevent favoritism, corruption, extravagance, and improvidence in the procurement of these things for the use of the state and its local self-governing subdivisions. Provisions of this kind must be so administered and construed as fairly and reasonably to accomplish their vitally important purpose. Only by sternly insisting upon positive obedience thereto as mandatory provisions of law have the courts found that the policy they uphold may be main-

tained. We deem it unwise to relax this policy, concededly an extremely valuable safeguard to the taxpayers of the municipalities of this state. We, accordingly, hold that, viewing the facts before us in this case, the requirements of Sec. 1774 are mandatory and that a contract made in disregard of them is void.

It is urged, however, inasmuch as it is established by the record that, as the work has been done on the town's streets and the dirt and gravel required by the terms of the contract aforesaid deposited thereon, it being also established that the town has accepted the same and retained and used the benefits thereof, the municipality has accordingly ratified the contract, is estopped to deny liability and, at any rate, may be held upon an implied contract for the work and materials furnished. Contentions of this character have been urged upon the courts of this country in a vast number of cases and, while in some jurisdictions there may be found decisions which support them, our search and study of the matter has lead us to the conclusion that the weight of authority and reason alike is with that line of cases which decline to allow contentions of this character to succeed.

Mr. McQuillin, in his work on the law of municipal corporations, has very well summarized his survey of the legal principles bearing on these points as follows:

"The doctrine which seems to harmonize with our governmental and legal system, which appears to be supported by reason, and which, therefore, should prevail may be thus stated briefly: If the charter or the statute applicable requires certain steps to be taken before making a contract, and it is mandatory in terms, a contract not made in conformity therewith is invalid, and ordinarily cannot be ratified, and usually there is no implied liability for the reasonable value of the property or services of which the municipality has had the benefit. These provisions exist to protect the citizens and taxpayers of the municipality from unjust, ill considered, or extortionate contracts, or those showing favoritism, and if the

municipality is suffered to disregard them and the other contracting party is, nevertheless, permitted to recover for the property delivered or the services rendered, either on the ground of ratification, estoppel or implied contract, then it follows as the night the day that the statute or charter provision can always be evaded and set at naught. Cases holding the contrary are usually based on the idea that it is unjust for a municipality to receive and accept the benefits of a contract and then turn around and defend an action to recover the contract price or the reasonable value, on the ground that the contract was not entered into as provided by statute or the charter, but it should be remembered that the other contracting party is charged with notice of the provisions of the statutes or charter in regard to contracting, and that the welfare and protection of the taxpayers and residents of the municipality is of more importance than the dispensation of justice to a private party in a particular case.''

3 McQuillin, Municipal Corporations (2nd Ed.), § 1266, p. 798-9.

The same author further says in Sec. 1283 of the volume last cited:

''The prevailing rule undoubtedly is that if the powers of a municipality or its agents are subjected by statute or charter 'to restrictions as to the form and method of contracting that are limitations upon the power itself, the corporation cannot be held liable by either an express or an implied contract in defiance of such restrictions.' ''

And in Sec. 1358 following appears this language:

''A municipality cannot be estopped to aver its incapacity to make a contract by receiving benefits thereunder. That is, it cannot be made liable either on the theory of estoppel or implied contract, where it had no capacity to make the contract or where it was made in express violation of law. * * *

''A contract which violates an express provision of the law cannot be ratified, e. g., one not awarded by competitive bidding, as required, or one that must be upon a consideration wholly to be performed after the making of the con-

tract, and to be in writing. Such invalid contracts cannot be ratified after performance.''

Abundant citation of authority is given to buttress the statements of the law thus made. See also, 19 R. C. L. 1068, § 356, 3 Page on Contracts, § 1965, p. 3354.

A comparatively recent case is that of Johnson County Savings Bank v. City of Creston, 212 Ia. 929, 231 N. W. 705, 707, 237 N. W. 507, where the court, referring to elaborate lists of cases in its support announces its conclusions relative to the contentions we are here considering as follows:

"It is a general principle that a municipal contract entered into in violation of a mandatory statute, or a contract in opposition to public policy is not merely voidable but void (Coggeshall v. Des Moines, 78 Iowa 235, 41 N. W. 617, 42 N. W. 650), and that no contract for services rendered or goods furnished pursuant thereto can be implied, nor may the acceptance of benefits thereunder be made the basis of a liability by estoppel. * * *

"Municipal corporations are the creatures of the legislature. They have such powers to contract, and only such powers, as the legislature grants to them. When the legislature withholds power to contract, or permits the exercise of the power in a given case only in accordance with imposed restrictions, the corporation may no more bind itself by implied contract than by the forbidden express contract. All persons dealing with a municipal corporation are charged with notice of the limitations upon its power. Those limitations may not be exceeded, defeated, evaded or nullified under guise of implying a contract. A municipal contract let without competitive bidding when the statute requires competitive bidding, is void, and no recovery may be had either upon the purported express contract or upon an implied contract to pay the reasonable value of the services or material furnished thereunder.''

So, in Frisbie Co. v. The City of East Cleveland, 98 Oh. St. 266, 120 N. E. 309, 311, considering a failure on the part of a municipality to obey a provision of law in its

tenor resembling Sec. 1774, supra, and affirming a judgment denying a recovery, the court said:

"Provisions of similar import and effect have been construed by this court in several cases, and in every instance the court has held such provisions mandatory, that a compliance therewith was a condition precedent to the power to enter into a valid contract providing for the improvement, that no implied liability arises against the municipality by the approval or acceptance of such improvement by its officers, and that the municipality is not estopped by the acts of its officers to rely upon the provisions of statutes relating to their powers in defense to actions upon contracts made in disregard thereof. * * *

"Here, as there, and in other cases of like character, it is alleged that the conclusion reached results in a hardship to the plaintiff. It would be difficult to perceive, however, how any special benefit would be afforded the public by either constitutional or legislative limitations and restrictions upon the power of inferior public bodies and boards to contract, if, notwithstanding the violation of such provisions, there can still be a recovery from the municipality. This plea of seeming hardship imposed by the rule adopted and applied in this state and elsewhere is well answered by the court in *McCloud & Geigle v. City of Columbus*, (54 Ohio St. 439, 44 N. E. 95), supra: 'An occasional hardship may accrue to one who negligently fails to ascertain the authority vested in public agencies with whom he deals. In such instances, the loss should be ascribed to its true cause, the want of vigilance on the part of the sufferer, and statutes designed to protect the public should not be annulled for his benefit.''

Likewise, in Bartlett v. City of Lowell, 201 Mass. 151, 87 N. E. 195, 197, where the superintendent of streets undertook to make a contract with plaintiff for the graveling of the city streets, in violation of a provision of law requiring purchase of such material to be made after public advertisement, the court affirmed a judgment denying the plaintiff the right to recover for the material furnished and said:

"The plaintiff's other contention is that, the defendant city having had the benefit of the plaintiff's gravel, should pay the reasonable value of it. But we are of opinion that that is not so.

"The plaintiff was chargeable with knowledge of the power of the superintendent of streets. Of that there is no doubt. *Boston Electric Co. v. Cambridge,* 163 Mass. 64, 39 N. E. 787; *Wormstead v. Lynn,* 184 Mass. 425, 68 N. E. 841; *Revere Water Co. v. Winthrop,* 192 Mass. 455, 78 N. E. 497.

"The plaintiff therefore is in this position: He undertook to allow his gravel to be used in repairing the streets of the defendant city, under an arrangement with a person who to his knowledge (for he was chargeable with that knowledge) had no authority to act for the city in agreeing to make compensation therefor. The gravel in question had been used in mending the city streets before the action was brought. The plaintiff's contention is that on those facts the court should make the city pay to the plaintiff the reasonable value of the gravel.

"If the court were to adopt that result it would be putting the seal of the law upon a plain evasion of St. 1896, c. 415, § 3; and if that be law all statutes imposing limitations upon the creation of municipal indebtedness can be evaded by a person who is not a contractor delivering personal property, and after that property has been used so that it cannot be restored, claiming to be paid the reasonable value of it."

It is unnecessary to multiply further citations or authorities in this connection. We consider the principles of municipal law as expressed by the excerpts given above as safe and sound and that to depart from them would be to open the door to abuses and practices fraught with the gravest dangers to the welfare of the citizens and taxpayers in the cities and towns of this state.

It is urged that it would have been an incongruity for the town council of the municipality to have advertised for competitive bids on the work of grading and graveling the streets because no one other than the plaintiff could have done it. This is said in view of the record testimony of the former mayor of the town and another member of its coun-

cil that they had made inquiries over a period of some time and could learn of no one who would be willing to undertake the job; that the plaintiff having moved his machinery and road work equipment to the vicinity of the town. in order to perform a large highway contract previously entered into by him with the state, he agreed to do this work for the town; that the cost of moving the plaintiff's machinery and equipment from the railroad to the vicinity of the town was far larger than the entire expenditure called for by the contract relative to the improvement of the streets of the defendant and that the plaintiff agreed to do the work for the same price that he had made the state, but that he would not charge for overhaul on the dirt. Our attention is directed, in connection with this testimony, to the case of Gleason v. Dalton, 51 N. Y. S. 337, 344, 28 App. Div. 555.

So far as this testimony is concerned, it can hardly be regarded as tenable that the mandatory statutory requirement of advertising for competitive bidding on a contract for work of this character could be abrogated by the statement of one or two members of a city or town council to the effect that they were unable to find anyone who could or would do the work. We say this, too, ascribing the utmost good faith on the part of such officials. They might quite easily have been seriously mistaken in their conclusions from the inquiries they made or have been intentionally misled by the statements of others. The parties who could really determine whether, under the circumstances, it was practicable and profitable for contractors to compete for the work proposed for the town were not the town council whose duty it was to let the contract, the inhabitants of the town, or even the District Court, but the contractors themselves, and their judgment could only be ascertained in the manner prescribed in Sec. 1774, supra.

As regards the testimony relative to the cost of moving plaintiff's general equipment to the vicinity of the town, it must be remembered that the outfit thus transferred was one

necessary for performing a large contract with the state. The cost of thus moving the minimum equipment necessary to perform properly the work actually needed by the town was not shown. It might very well be that such cost would have been radically lower than that shown in the record. It is doubtless true that no other contractor could move another outfit of similar size with that of the plaintiff to the vicinity of the town and compete with plaintiff in the doing of the relatively small job required by it, but that is not exactly the point here involved. A contractor with a minimum of equipment necessary to properly perform such work as might be reasonably necessary for the municipality under the circumstances, might have been able to do so.

It may be observed further concerning the testimony that the cost agreed upon in the questioned contract was somewhat less than that fixed in plaintiff's state contract, that the latter dealt with work upon an arterial state highway over which the through traffic for a large section of our state passes. Necessarily, the work done on such a contract would have to be of such standard as would in due measure withstand the traffic traveling over such a highway. It does not appear that work of this high class was vitally necessary for the streets of a town of some 300 inhabitants. Frequently, an article or service of moderate cost will do quite as efficiently in a particular place as those far more expensive. Indeed, the record before us discloses that the plaintiff, by the action of the very town officials who let this contract, was relieved of putting gravel upon a certain street of the town included within the contract because ashes from the heating plant of a nearby school building had been placed thereon and the town council deemed additional surfacing unnecessary.

It may especially be noted here that Sec. 1774 requires that the advertisement calling for competitive bids shall contain ''complete specifications of the number, size, kind, and quality of material and services required.'' This serves not only the purpose of advising the bidders as to what

class of work and material will be needed by the municipality, but also its taxpayers concerning what sort of service and material is proposed by the council to be used for the object in hand. Opportunity for protest and correction is thus afforded if a mistake is being made. While it is true that the inhabitants might casually know in a general way of the character of the work proposed without such advertisement, their knowledge would not be definite and specific as it should be and as the statute obviously contemplates. Finally, of course, the ultimate and conclusive answer to all these contentions is: *"Ita lex scripta est."* As said by Chief Justice Marshall in Osborne v. Bank of United States, 9 Wheat. (U. S.) 738, 866, 6 L. Ed. 204: "Judicial power is never exercised for the purpose of giving effect to the will of the judge; always for the purpose of giving effect to the will of the legislature; or, in other words, the will of the law."

We have examined carefully the case of Gleason v. Dalton, supra, and consider that it can have no application to a case such as is now at bar. There the appellate division of the Supreme Court of New York reversed a decree granting an injunction against Dalton as commissioner of the water supply of New York City, restraining him from entering into a contract with a private corporation for the supply of water to the borough of Queens in that city, unless proposals for this supply of water should first have been invited by public advertisement as provided by Sec. 419 of the "Greater New York Charter." It was admitted that no such advertisement had been or was intended to be made. Construing the provisions of that charter, the following excerpts from the opinion of the majority of the court —there was a dissent by one of the judges—exemplify, as we read it, the true purport of the decision:

"The large powers which are invested in the commissioner of water supply seem to be clearly inconsistent with the provision which requires competitive bidding before a contract can be executed. * * * We therefore reach the conclusion,

from a consideration of the charter as a whole, that the purpose which it seeks to accomplish does not embrace, within the section which requires competitive bidding, contracts having reference to the supply of water to the municipality. * * * If the legislature desires to make the supply of water the subject of competition, it also has the power so to do; but until it shall have so legislated the courts are powerless to command a different rule. We reach the conclusion that the legislature has not yet so expressed itself, in consequence of which the commissioner of water supply and the board of public improvements have power to authorize and make a contract similar to the one now before us.''

It is not contended here and cannot be that our statutes may be so construed as to have contracts for over $200 relative to the grading and graveling of streets in cities and towns of this state excepted from the requirements of Sec. 1774, supra.

The record additionally shows and it is conceded that the council disregarded the prohibition contained in the first sentence of Sec. 1757 above quoted which forbids added corporate expenditures in any one year over and above the amount provided for in the annual appropriation bill of that year, unless it is otherwise provided by law. 5 McQuillin on Municipal Corporations, § 2348, p. 986, upon the authority of many cases, says: ''Where laws limit the time of making the annual appropriation, and forbid making further appropriations during the fiscal year, any further appropriation than the annual is unauthorized and void.'' In order to escape from the consequences flowing from such a disregard of the law, plaintiff relies upon that part of Sec. 1757 aforesaid, contained in the final proviso clause thereof which allows ''any improvement'' to be established, ''the necessity of which is caused by any casualty or accident happening after such annual appropriation is made,'' such improvement being first ordered by a ''four-fifths vote'' of the town council. It is said that there was an emergency or casualty existing because excessive wet weather conditions rendered the streets of the town impassable.

There are several answers to this contention, either of which seems to us conclusive against it.

First. The evidence as to the condition of the streets was conflicting and the trial court's finding against plaintiff, so far as this court is concerned, settled that there was no casualty or emergency. This principle has been so many times applied by our decisions, it is unnecessary to here take time or space to cite them.

Second. While testimony was given that owing to unusual rainfall during the preceding spring, the streets were in bad condition then, the undisputed proof, however, is that the contract in question was let by the town council on September 21, 1929 and that during that month up to that date, only 59/100 of an inch of rain had fallen and the streets were not at that time excessively wet, dangerous or impassable. There was, therefore, in that respect no such casualty, accident, or emergency, as that term is ordinarily construed in statutes of this character. For example, in Los Angeles Dredging Co. v. City of Long Beach, 210 Cal. 348, 291 Pac. 839, 843, 71 A. L. R. 161, the court says:

"By definition, the term 'emergency' implies a sudden or unexpected necessity requiring speedy action. San Christina Inv. Co. v. City and County of San Francisco, 167 Cal. 762, 773, 141 Pac. 384, 52 L. R. A. (N. S.) 676; Spreckels v. City and County of San Francisco, 76 Cal. App. 267, 244 Pac. 919; Mallon v. Board of Water Commrs., 144 Mo. App. 104, 128 S. W. 764. Instances of judicial recognition of emergencies may be found in North River Electric L. & P. Co. v. City of New York, 48 App. Div. 14, 62 N. Y. S. 726, where the necessity of securing street lighting was held to be an emergency which dispensed with the ordinary formal requirements of a municipal contract; and in Sheehan v. City of New York, 37 Misc. Rep. 432, 75 N. Y. S. 802, where the immediate possibility of frost was held to constitute an emergency which justified a contract for materials to construct a greenhouse. See, also, 2 Dillon, Municipal Corporations (5th Ed.) § 802; 3 McQuillin, Municipal Corporations (2nd Ed.) § 1295.''

And in Safford v. City of Lowell, 255 Mass. 220, 151 N. E. 111, 113, the city's charter provided:

"No contract for construction work or for the purchase of apparatus, supplies or materials, whether for repairs or original construction, the estimated cost of which amounts to two hundred dollars or more, except in cases of special emergency involving the health or safety of the people or their property, shall be awarded unless proposals for the same have been invited by advertisements."

It appeared that the city had purchased for repairing its streets what was called "cold patch" material—a mixture of broken stone and a petroleum product in an amount costing a great deal more than $200—without complying with the requirements of the quoted provision of law. Suit was brought to enjoin the city and its officials from making payment for the material thus purchased and used upon the city streets. Upon reference, the master found in substance that many of the streets were defective and to some extent dangerous, but none were impassable, none closed to travel, and no warnings displayed. Commenting on the findings, the court said:

"They show that while danger of injury to person and property existed, the conditions did not differ except in degree from those ordinarily to be expected after a winter when little snow has fallen to protect the surface of the ways, and that in degree the difference was rather in the larger number of opportunities for accident than in the greater danger of serious injury. The conditions did not occur suddenly or unexpectedly. None of the causes was unusual. As early as February it was evident what the condition in April would be, if nothing were done. When the street surface begins to disintegrate, rapid action is necessary to prevent resulting damage from spreading quickly."

Holding that the plaintiffs were entitled to a decree, to the contention that an emergency existed within the terms of

the law authorizing the contract for the street repair material, the court responded:

"It would be to misuse language to describe the condition which existed April 15 as 'a special emergency involving the health or safety of the people or their property.' Without attempting an exact or all inclusive definition, it is manifest that that language does not apply to a condition which may clearly be foreseen in abundant time to take remedial action before serious damage to the health or to the safety of person or property is likely to occur. Without doubt, lack of foresight and failure to take proper precaution to meet contingencies which any prudent person would anticipate, might occasion a condition which would jeopardize public health and safety, and to which the words of the statute would be applicable. It would be remarkable, however, if the legislators used them to describe such a situation. It is not to be supposed that they intended to make it possible for municipal officers to avoid advertising for bids for public work by merely delaying to take action to meet conditions which they can foresee until danger to public health and safety has become so great that the slight further delay caused by advertising will entail public calamity. No such imminent danger of calamity existed here."

See, also, note on the point appended to the Los Angeles Dredging Co. case, supra, in 71 A. L. R. at 173.

The argument is advanced that the proof establishes that the contract attacked was "so changed by the parties themselves before the work commenced that it was nothing more than a contract of hiring from day to day." This is urged in the light of evidence in the record to the effect that the street and alley committee of the town council gave directions which plaintiff followed in placing the gravel on the town streets and that these directions were given from day to day. Yet, the former mayor of the town, as a witness for plaintiff, himself testified that when "they changed from one street or finished a certain piece of work, they were within the understanding covering the contract." We do

not think that the proof shows any attempt by the respective parties to split up the original contract into a hiring from day to day, if that could be done, in an effort to evade the provisions of the statute requiring competitive bidding.

In People v. Lamon, 232 Ill. 587, 83 N. E. 1070, 1071, the statute required municipalities to let sidewalk contracts upon advertisement to the lowest responsible bidder where the expense exceeded $500. Sidewalks were laid along a street, but this law was disregarded. Four separate contracts were made between the authorities and the contractor, each for less than $500 expense. Disallowing the contention that it was unnecessary to advertise for bids, the court said:

"The contracts are identical in every respect, except that each concerns the construction of a sidewalk in front of a different lot. The four contracts, when read together, constitute a contract to construct 258.06 lineal feet of sidewalk, fourteen feet wide, in front of the four lots belonging to appellants, at fourteen and one-half cents per square foot. No reason is suggested and no explanation is attempted by appellee for splitting up this improvement into four separate contracts. The reason for the course pursued is apparent. It is manifestly a mere shift for the purpose of evading Section 7 of the sidewalk statute. If the method pursued by the city is sustained, Section 7 of this statute will be rendered nugatory. If the sidewalk in front of each lot is to be regarded as a separate and distinct improvement it would probably never happen that the cost of constructing a sidewalk in front of a single lot would exceed $500. Under appellee's contention a sidewalk extending the entire length of a street may be constructed at a cost of many thousand dollars and a private contract entered into for the entire work. The only thing necessary to evade the statute is to execute a duplicate contract for that portion of the walk in front of each lot."

See also Tompkinsville v. Miller, 195 Ky. 143, 241 S. W. 809.

Our conclusion, therefore, is that the District Court was right in adjudging that plaintiff take nothing by his petition and that it be dismissed.

Passing to a consideration of the right of the town by its counterclaim to recover back the money it has already paid plaintiff for the work and material placed upon and benefiting its streets, we are cited by counsel to general statements of the law, such as: "Payments made by the municipality to the contractor may be recovered by it in a proper case, as where the contract is *ultra vires*," 44 C. J. 408, § 2611; and "It is well settled that money paid by a municipal corporation upon a void contract or for an illegal purpose may be recovered back by such corporation," 19 R. C. L. 1167, § 441. Cases are listed as supporting these statements. We have examined them all with care. With the general principles thus announced, there is, of course, no fault to be found; the difficulty lies in applying them to the "proper case" and, for reasons presently to be given, we do not regard them as controlling under the circumstances presented by this record.

It is established in this case that the money whose recovery is now sought was voluntarily paid to the plaintiff by the town council more than a month after the dirt and gravel had been placed upon the town's streets by him. The payment was not made secretly, but in the usual way in which the town paid its bills and at a meeting at which all the members of the council except one were present. It is not asserted for the town that there was any haste, fraud, undue influence, or collusion involved in making the payment. None of the town officials were interested in the contract personally or were obtaining any profit in consequence of its letting. It is conceded, also, that plaintiff's work and material have gone into and become a part of the town's streets and cannot be returned to him. The legal claim for the return of this money was not made until more than a year had elapsed since its payment. So far as can be told from the record, the action of the town officials in paying

over the money was taken in good faith in an honest endeavor to correct what they believed a very unsatisfactory condition prevalent in the condition of the town's streets. It must be admitted, too, that so far as this branch of the cases at bar is concerned, the payment made as aforesaid by the town council to the plaintiff was not contrary to any principle of the common law or of good morals.

The action presented by the counterclaim before us is essentially an action for money had and received. It is generally the case in such a proceeding that, in the absence of mistake, deceit, fraud, duress, oppression, or undue influence, the parties seeking to recover must be equitably entitled to a repayment of the money or no recovery can be had or repayment compelled. As said in 41 C. J. 28-29: "An action for money had and received, although an action at law, is governed by equitable principles, and in it plaintiff waives all torts, trespasses, and damage. It may, in general, be maintained whenever one has money in his hands belonging to another, which, in equity and good conscience, he ought to pay over to that other," and 2 R. C. L. 778, § 34, on the same subject declares that the action for money had and received is "maintainable in all cases where one person has received money or its equivalent under such circumstances that in equity and good conscience he ought not to retain it and *ex aequo et bono* it belongs to another. This is so irrespective of whether the money was received from the plaintiff or from a third person. The action being in its nature equitable, to entitle the plaintiff to recover, if anything of value has been received, it must be shown that it was tendered back before the action was brought."

The equitable principles thus governing the counterclaim at bar for the recovery of the money paid by the town have been applied as well to proceedings brought by municipal corporations as to those instituted by ordinary suitors. The authorities so show.

Thus, we find 19 R. C. L. 1063, § 351, making the statement that where "The contract is invalid by reason of the

lack of power to enter into it, and, if invalid as to one of the contracting parties, it is also invalid as to the other. One who has performed in good faith a contract of this character and received the stipulated price cannot be compelled in an equitable proceeding to refund the money thus received.'' Necessarily, however, the invocation of a general proposition of this sort will depend to a large degree upon the facts of the instant case.

In Miller v. Jackson Township, et al., 178 Ind. 503, 99 N. E. 102, 108, the action was by taxpayers to recover of a township officer and his sureties funds which he had paid out in large sums in disregard of statutes requiring prior due appropriations and the letting of contracts for supplies to bidders after giving the requisite statutory notice. Reversing the judgment below which had permitted a recovery for certain of the payments in suit, the court said:

"It does not necessarily follow, however, that where, without fraud, a void contract between a public officer and another for furnishing necessary supplies to a municipality, has been fully executed by both parties thereto, the municipality may recover from the officer the money expended under such void contract. * * *

"But we cannot sanction the theory that taxpayers may stand by for a long period of time, and, without protest, permit a trustee, in good faith, but through ignorance of law, to expend public funds for lawful and necessary objects, but without complying with all the statutory requirements, and then, months after the expiration of his term, demand the restoration to the treasury of the funds so expended; the taxpayers in the meanwhile retaining, or having used the proceeds of the expenditures. From such doctrine, conscience naturally recoils. Originally, courts of equity interposed their jurisdiction only to enforce the requirements of conscience and good faith. Pomeroy, Eq. Juris. (3d Ed.) § 398. The maxim, 'He who comes into equity must come with clean hands,' is a universal rule guiding and regulating the action of chancery courts. This rule bars the granting of any relief to appellees, in respect to the matters averred in the separate answers of the sureties, for the taxpayers come into a court of equity with

hands laden with the fruits of the trustee's purchase, while they pray a decree for the restoration of the purchase price thereof. * * *

"It is inconceivable that it was the legislative intent to promote official integrity by granting to the taxpayers letters of reprisal authorizing them to prey on the earnings of the officer and sureties by retaking the price paid for necessaries honestly purchased for, and used by, them. Such design is as abhorrent to good conscience as were bills of attainder prohibited by our federal Constitution, and the language of the act neither requires nor justifies the imputation of such legislative intent. The separate answer of the sureties stated a cause of equitable defense, and the court erred in sustaining the demurrer thereto."

In Village of Pillager v. Hewett, 98 Minn. 265, 107 N. W. 815, 816, it appeared that the village and the defendant entered into a written contract for the erection by the latter, under certain plans and specifications, of a bridge needed by the former. The defendant built the bridge as agreed. Shortly thereafter, the village council inspected the structure and accepted it. The village then paid to the defendant the sum of $500 in cash and delivered to him its bonds in the sum of $1300, pursuant to the agreement as made. Subsequently, it refused to pay the balance of the contract price. The contract was entered into privately and not upon and after advertisement for bids as the law required. It also appeared in the case that the contract had been entered into by the parties in good faith and that the price thereby agreed to be paid for the bridge was fair and reasonable; that the bridge was necessary for the village, appropriate to the place, such as was required by the physical conditions and the village was justified in contracting for and constructing it. It further appeared that, after the acceptance of the bridge, it was carried away by a flood. This action was brought by the village to recover the money paid and the bonds delivered to defendant as aforesaid, on the ground of the illegality of the contract. The trial court denied a recovery. In affirming this judgment, concerning the controlling point in the case, the court said:

"We have, then, a case where the plaintiff, a municipal corporation, was authorized by law to enter into a valid contract for the building of a bridge, and in form did so with the defendant, but by reason of its failure to comply with the details required by the statute (Laws 1885, p. 170, c. 145, § 51), in letting the contract, it was void. It may be conceded that the defendant could not have maintained an action on the contract to recover the contract price for the bridge, although he had fully performed the contract on his part; for upon the grounds of sound public policy the doctrine of *ultra vires* is applied with greater strictness to municipal than to private corporations. This, however, is an action, in the nature of an action for money had and received, which is based upon equitable principles, to recover back the consideration paid by the plaintiff to the defendant for building a bridge which was accepted by it, and which fully complied with the terms of the contract. The fact that the bridge was afterwards carried away by a flood is not material, for it was not due to any fault of the defendant or any one else. After the acceptance of the bridge it became public property, which from its nature could not be restored to the defendant, and, of necessity, the plaintiff would retain and enjoy the benefits thereof so long as it stood. The defendant in good faith received the money and bonds in payment of the bridge which he had built for the plaintiff. The consideration for such payment was full and fair, and, in equity and good conscience, it ought to have been made by the plaintiff. Such being the case, it would be most inequitable and unconscionable to compel the defendant to return the money and bonds paid to him under the circumstances found by the trial court, and we hold that the plaintiff cannot maintain this action to recover them."

The case of State ex rel. Hunt v. Fronizer, 77 Oh. St. 7, 82 N. E. 518, 520, was one instituted under a statute of the State of Ohio which authorized the prosecuting attorney to recover back county funds which had been misapplied or illegally drawn from the county treasury. It appeared that the county commissioners had let a contract for the erection of a bridge to the defendants, which had been fully executed and the money had been paid them for the bridge. Another state statute positively forbade the commissioners to enter

into any contract unless a certificate was obtained from the county auditor that the money for the obligation to be incurred was in the treasury to the credit of the fund or was in process of collection, and any contract made in violation of this law was by the law declared to be void. No certificate, as thus required, had been obtained relative to the bridge contract. The court of common pleas, the circuit court, and the Supreme Court of Ohio all concurred in denying a recovery of the money thus paid, the court of last resort in the state saying in the course of its opinion:

"And, putting the question presented in terse form, it is whether or not Section 1277, as above given, authorizes the recovery back of money paid on a county commissioners' bridge contract fully executed but rendered void by force of Section 2834b, because of the lack through inadvertence, of the county auditor's certificate as therein required, there being no claim of unfairness or fraud in the making, or fraud or extortion in the execution of such contract for such work, nor any claim of effort to put the contractor in *statu quo* by a return of the bridge or otherwise, the same having been accepted by the board of commissioners and incorporated as part of the public highway.

"This court is of opinion that such recovery is not authorized. The principle applicable to the situation is the equitable one that where one has acquired possession of the property of another through an unauthorized and void contract, and has paid for the same, there can be no recovery back of the money paid without putting, or showing readiness to put, the other party in *statu quo,* and that rule controls this case unless such recovery is plainly authorized by the statute. The rule rests upon that principle of common honesty that imposes an obligation to do justice upon all persons, natural as well as artificial, and is recognized in many cases. *Chapman v. County of Douglas,* 107 U. S. 348; *Lee v. Board of Commissioners,* 52 C. C. A. 376, 114 Fed. 744; *Wrought Iron Bridge Co. v. Utica,* (C. C.) 17 Fed. Rep. 316."

In Miller v. City of Des Moines, 143 Ia. 409, 122 N. W. 226, 232, 23 L. R. A. (N. S.) 815, 21 Ann. Cas. 207, suit was brought to restrain the performance of a printing con-

tract let by the city council and for a return of considerable sums of money paid under it. The trial court held the contract properly awarded. This holding was reversed on review, the appellate court finding that the award of the contract had been arbitrarily made and not in the exercise of legal discretion, in considering the comparative merits of the submitted bids, as required by law. The action of the council was accordingly declared void. Affirming that part of the judgment of the trial court denying a recovery of the sums already paid on the printing contract, this language was used:

"In any event the work has been done; it has been accepted by the city; it is of a character which can not be returned to the contractors and thus place them in *statu quo;* it is work which if not done by this contractor would have to be done by some other person; the prices charged are not shown to be unreasonable; the invalidity of the contract is not chargeable to any wrong or omission on the part of the contractor, but solely to the act of the city through its council. To say that the party doing such work must receive no remuneration therefor, and must return the compensation already received, is to impose all the penalty upon an innocent party for the profit of the only party chargeable with the wrong. We are not disposed to so order. Courts of equity often refuse to enforce a naked legal right where the results would be manifestly unjust or unconscionable."

A case frequently cited regarding the point we are considering—indeed it is called to our attention by the brief on behalf of the town in the case at bar—is that of Frederick v. Douglas County, et al., 96 Wis. 411, 71 N. W. 798, 802. There, the suit was by taxpayers of the county to restrain the county and its officers from paying additional sums to one Grace on a contract for his services as attorney for the county in certain tax cases and to compel him to refund to the county several thousands of dollars which had theretofore been paid. The trial court held the contract void, enjoined further payments thereon and ordered a return of

the moneys paid. The legal principle determined there was that the county board of supervisors had no power or authority to employ Grace to take charge of the tax cases and bind the county for the value of such services. Affirming that part of the decree restraining further payments, but reversing the part directing a refund, the appellate court, in discussing the point of interest to us now, said:

"It is not difficult to find cases holding to the full extent the doctrine that where public officers have made an illegal appropriation of public money, and the money has been paid, it may be recovered in a proper action brought either by the corporation or by taxpayers on behalf of the public. Such actions have generally been actions in equity brought to restrain the further misappropriation of funds, and as an incident of full relief to recover back moneys already paid; and it may be stated as a uniform rule that in such cases such moneys may be recovered back, especially where there is any ground to charge fraud, corruption, or concealment in the transaction. * * * But while we believe it to be salutary and a correct principle of law to hold that moneys paid out by municipal officials in violation of law may be recovered from the recipient in an action seasonably brought, especially where the transaction is marked by haste, fraud, collusion, or concealment, we believe there are cases in which the circumstances are such that a court of equity ought not to decree the return of money merely because the appropriation thereof was unauthorized, and such a case we believe to be before us now.

"The evidence and the findings show that Mr. Grace's employment began in January, 1895, and it was a matter of public notoriety, and the plaintiff himself and presumably all taxpayers who kept track of the public proceedings knew that he was employed as early as the spring of 1895; that he performed large and valuable services, for which he was from time to time paid; and that not only he, but the county board, acted in entire good faith in the matter. There was no haste and no evidence of collusion or concealment. Mr. Grace's services ran through a number of months, and he undoubtedly has fully earned all the money which has been paid him. During all this time the plaintiff and his fellow taxpayers remained silent, and allowed the services to be rendered and the money to be paid. They took

no action until the latter part of November, 1895. Then they came into a court of equity, and asked for the stoppage of all payments in the future, and to this they are undoubtedly entitled. But he who comes into a court of equity must do equity. Could it, under any view of the circumstances, be said to be equitable to compel Mr. Grace to pay back the money which he received for long and valuable labors, rendered honestly and in good faith, the benefit of which the corporation has received, and concerning which the taxpayers of Superior were, or ought to have been, fully informed during their entire progress? Were a court of equity to make this judgment under the circumstances, we should regard it as having become an engine of oppression, rather than an instrument of justice.''

The case last cited was thereafter followed by the same court in Ellefson v. Smith, 182 Wis. 398, 196 N. W. 834, 835, where money was paid out under a contract for building a reservoir for the city, the contract having been let by the city officials of Viroqua, Wisconsin, without any advertisement for bids having been made, no specifications for the work having been provided and the contractor having furnished no bond as required by the state law. The suit was one in equity to compel restoration to the city treasurer of the money thus expended by the city officials and the contractor. Affirming a judgment dismissing the suit, the following excerpted language indicates accurately the view taken by the reviewing court:

''Here the city had the power to build a reservoir. The reservoir was, and is, a public necessity. It was built at a fair price. It has been accepted by the city and is in use as a necessary part of the water system. There appeared to the officials to be an emergency, owing to the lateness of the season, to let the contract promptly to save increased cost owing to freezing of the ground. The officials believed the welfare of the city would be best served by letting the contract without waiting for bids. They were advised by a civil engineer of experience, in the city's employ, as to the reasonable cost of such a structure. The officials profited not at all by the contract, nor does it appear that the city suffered in any way by the failure of the officials to comply

with conditions precedent to letting a valid contract. The contract was let at a regular public meeting of the council, the work was done in full public view, and it was a matter of public comment in the press and discussion among the citizens.

"The plaintiff taxpayer did not know of the contract or the failure of the officials to comply with the law until shortly before he commenced the action. But he is suing in a representative capacity, and the court found facts from which it would seem that the taxpayers generally must have had more or less knowledge of the actual facts while the work was proceeding and before it was commenced. Viroqua is a small city, and such matters of importance to the city would hardly escape general notice. We do not, however, base our decision on laches of the taxpayers plaintiff.

"The case is one where the city has the full benefit of the improvement necessarily made, the price was fair, and the city cannot turn over to the defendants the property so built for the city. A court of equity does not sit to inflict punishment, but rather to do justice on well-defined principles. We do not recognize any appeal to conscience in this matter. No one has been injured in his person or property rights."

See, also, Murphy v. Paull, 192 Wis. 93, 212 N. W. 402.

Under these authorities and the facts of the instant case, we think it clear that no recovery of the money paid out to the plaintiff by the town council should be permitted. To affirm the right to such a recovery would, as pertinently said in the case of Frederick v. Douglas County, supra, be to allow a court of equity to "become an engine of oppression, rather than an instrument of justice." It may very well be that where a payment of the character here before us is infected by haste in disbursement, willful evasion of the law, fraud, collusion, concealment, or elements which disclose violation of principles of public policy, money thus paid by a municipality might and should be recovered. Our thought in that regard is well illustrated in the case of Miller v. Jackson Township, supra. In that case, a recovery was permitted of moneys paid by the township officer to himself

for goods purchased for the county from, and supplied by, himself. The court remarked, ''It may be stated as a general proposition that the township can never incur a liability for goods purchased by the trustee from himself, though there be a compliance with all the provisions of the advisory board act. Public policy forbids it, * * *'' To the same effect, see City of Bangor v. Ridley, 117 Me. 297, 104 Atl. 230; Stone v. Bevans, 88 Minn. 127, 92 N. W. 520, 97 Am. St. Rep. 506; McNay v. Town of Lowell, 41 Ind. App. 627, 84 N. E. 778.

The District Court, accordingly, correctly decided that the town should take nothing by its counterclaim and the judgment under review should be affirmed. Each party shall pay his own costs in this court.

*Affirmed.*

. KIMBALL, C. J., and BLUME, J., concur.