QUACKENBUSH, ET AL v. CITY OF CHEYENNE, ET AL.

(No. 2021; July 27, 1937; 70 Pac. (2d) 577)

For the plaintiffs and appellants, there was a brief and oral argument by *Charles E. Lane* of Cheyenne.

For the defendants and respondents, there was a brief and oral argument by *Harry B. Henderson, Jr.*

150

For defendants and appellees, there was also a brief and oral argument by *William E. Mullen* of Cheyenne.

BLUME, Chief Justice.

This is an action brought on April 11, 1936, by taxpayers against the City of Cheyenne, its mayor and commissioners, for a declaratory judgment as to the validity of transactions hereinafter mentioned. The trial court declared them valid, and an appeal has been taken by the plaintiffs, appellants herein, from the judgment entered herein.

The petition discloses the following facts: The plaintiffs are citizens and taxpayers of the City of Cheyenne. The City is a municipal corporation, operating under a special charter, but also under the commission form of government, and the defendants are the Mayor and the Commissioners of the City. The Home Builders Company is a private corporation, organized for gain on August 23, 1935. Archie Allison, the Mayor, was a director and stockholder in the corporation. On August 26, 1935, the Mayor and Commissioners of the City sold sixteen lots in the Airport Addition to the City of Cheyenne to the Home Builders Company for the sum of $4150.00, or a little over $250 per lot, and made and executed a deed to the purchaser. Thereafter brick houses and frame garages were erected on the lots by the purchaser above named, of the value of approximately sixty-five thousand dollars, and Archie Allison, the Mayor, had the contracts for the erection of these buildings. Thereafter, and commencing on February 26, 1936, the City offered the above mentioned lots for sale at public auction. On March 19, 1936, bids for the lots were received, pursuant to advertisement, and the Home Builders Company, together with three others, purchasers from the Company, bid the sum of $65,886.16, in addition to the $4150.00 previously paid. On the following day, namely, on March 20, 1936, a check for the amount was received from the Home Builders Company, and was accepted, and a deed was ordered executed. A claim for $65,-886.16 was filed with the City for the value of the improvements placed upon the lots, and this amount was allowed and paid. In the meantime, and on March 18, 1936, objections were filed by counsel for the appellants herein with the City of Cheyenne to the sale of the premises. Plaintiffs accordingly prayed that the court declare the legal effect of the transactions above mentioned. The defendants in the case answered, ad-

mitted and denied some of the allegations; trial was had before the court without a jury. Among other things, it appeared that one Frank Yager bought from the Home Builders Company two of the lots for about $1240.00, and that the sum of $1640.00 was bid for these lots at the public auction hereinbefore mentioned, the difference in these amounts not being explained. Allison admitted that he was a director and stockholder in the Home Builders Company, and that subsequent to the sale in August, 1935, he became interested in the erection of the improvements on the lots sold. He also testified that the lots were sold for their fair value, and that he made no profit whatever out of the transactions herein mentioned, and that the city sold the lots in question at the request of the Home Builders Company. The appellants offered testimony that the lots were of greater value. This testimony was, over objection, rejected by the court. Mr. Klett testified that Mr. Patterson, of the United Air Lines Company, took up the matter of providing housing facilities and adequate homes for the employees at Cheyenne Airport with the President of the Chamber of Commerce, and that the transactions of the purchase of the lots here in question originated in that manner; that the Home Builders Company was formed "as a matter of a civic organization"; that the plan was to enlist the aid of public spirited citizens to put up the money to go ahead with the plan of providing adequate homes; that, not being able to obtain title to other lots, the parties turned their attention to the lots here in question ;that the officers of United Air Lines desired homes built as close to the Cheyenne Airport as possible; that it was imperative to act at once; that the corporation was not organized for profit or gain; that the lots were all figured at an equal price except two (apparently those subsequently acquired by Yager, which were valued at $1140) ; that the price paid for

the lots was fair and reasonable; that the lots were immediately improved after the sale in August, 1935 (except, perhaps, two), and the buildings erected thereon were occupied; that the bids for the improvements received were higher than anticipated, on account of the fact that the employees of the Cheyenne Airport would not buy homes if the price were too high; that Mr. Allison offered to construct them at a price approximately $1500 lower than that offered by anyone else. It further appears that the actions taken by the city as hereinabove mentioned were by a unanimous vote of the Council. Thereafter, the title to the property was examined and found to be defective, and immediately thereafter steps were taken to correct the defects, and the public auction heretofore mentioned was held for that purpose. The property was thereafter resold by the Home Builders Company to various parties, including W. H. Andrew, Frank Yager and Alvin W. Harris, and the Company sustained a net loss of $1 for each of the lots which were bought. The offer which was made at the time of the auction represented the $4150 originally paid for the lots, plus the value of the improvements thereon. At that sale, that is to say, the auction sale, a separate bid was made by W. H. Andrew, for Lot 4, in Block 3, Airport Addition, and a separate sale of the property was made to him. A separate bid also was made by Frank R. Yager for Lots 3 and 4 in Block 4, Airport Addition. This was accepted and the property was sold to Frank R. Yager by the city, and a conveyance was executed to him. The remainder of the lots were sold to the Home Builders Company and a conveyance executed to it.

Certain statutory provisions have been referred to in the briefs of counsel, among them Section 95-101, R. S. 1931, which provides that it shall not be lawful for any official to become in any manner interested in any contract in connection with which such officer may

be called upon to act or vote, and that all contracts made in violation shall be null and void. Section 22-148 R. S. 1931, provides as follows:

"Before sale is made of any real and personal property of any municipal corporation in the state of Wyoming, of the value of one hundred dollars or more, an advertisement of said intended sale, describing said property offered to be sold, together with the terms of sale, shall be published in four issues of some newspaper having general circulation in said community, and calling for sealed bids for purchase of said property. Upon the opening of the bids provided for in the foregoing section, the property shall be sold to the highest responsible bidder for same. The responsibility of the bidders shall be determined by the judgment of the governing body of the city or town affected by said sale."

Counsel for appellant is correct in contending that municipal contracts in which officers of the city have a personal pecuniary interest are, ordinarily at least, void or voidable. 44 C. J. 89. The rule has been applied to purchases and conveyances of real estate. 44 C. J. 92. We will not decide herein the disputed questions whether section 95-101, R. S. 1931 applies herein, or whether the above mentioned rule is applicable when a sale is made at public auction, as provided by Sec. 22-148, R. S. 1931. In 44 C. J. 93, it is stated that, "an interest to invalidate a contract must be of a personal or private nature, so that an interest incident to membership in an association organized for public welfare and not for profit will not have that effect (invalidating a contract with a municipality)." The testimony in this case shows that the Home Builders Company was organized for the public benefit and not for profit, and that the venture resulted not in a profit, but in a loss. It is argued that the company made a profit out of the Yager lots, but that would be of minor importance if, in fact, the venture as a whole resulted in a loss, and it is somewhat difficult, from an equit-

able standpoint, to see why citizens should be penalized if in fact acting for the public benefit, and no case has been cited, and we have found none, where that has been done. Yet the company was organized as a private corporation—as indeed it was required to do in order to get back the money put into the venture. So the case is perhaps one on the border line, and one sui generis, and we shall not, at this time, decide as to whether or not the rule last stated should be applied in this case. The foregoing questions, as we shall see, may ultimately become merely academic in this case. If we should admit the original invalidity of the sale of August 26, 1935, as well as of the auction sale, for the reasons claimed by counsel for appellants, we should not have progressed far in the solution of the problems before us, for the reason that the situation changed from the time of the sale in August, 1935, and parties are interested who are not before the court, but whose rights must be considered the same as the rights of the city. And though not necessary, it appears to be advisable to point out what we conceive to be at least some of the fundamental factors which must not be overlooked in the ultimate solution of the contentions herein.

The mere fact, standing by itself, that the lots should have been sold for a somewhat higher price than$4150 —that is to say that the sale was improvident—does not, in the absence of illegality, fraud or clear abuse of discretion, authorize a suit on behalf of the taxpayers, for the reason that the sale of the property is, by statute, left to the judgment of the council. City of Terre Haute v. Water Works Company, 94 Ind. 305, McQuillan, Munic. Corp., (2nd Ed.) Sec. 1254, 2578; Cox v. Jones, 73 N. H. 504, 63 Atl. 178; Walter v. McClellan, 48 Misc. 215, 96 N. Y. S. 479. That is in line with the well-settled rule that "a court of equity will not interfere at the suit of a taxpayer to restrain the

officers of a municipal corporation in the exercise of their discretionary power with regard to the control or disposition of the property of the municipality, in the absence of illegality, fraud, or clear abuse of their authority." Seafeldt v. Astoria, (Or.) 16 Pac. (2d) 943; Haesloop v. City Council, 123 S. C. 272; 115 S. E. 596; 44 C. J. 1411. If the lots were in fact sold for less than their face value, that fact could doubtless ordinarily be shown as bearing on the good faith of the parties to the transaction. But that good faith is not seriously questioned herein. We should, perhaps, point out that in this instance hardly anyone would have expected the city to exact the last penny which could have been exacted. The lots were vacant. It was expected and desired that they should be improved immediately. Other purchasers might not have been willing to do so—a matter of no mean importance to the city. The improvements were made. About $65,000 was added to the taxable value of property in the city; and the income from it, accruing to the city through taxation, would thus in a few years equal the amount paid for the lots by the Home Builders Company, without mentioning the county, school district and state taxes, in all of which the taxpayers of the city are interested. The property appears to have been bought through a patriotic motive, not—primarily at least—for profit. There were not sufficient housing facilities for the employees of the Cheyenne Airport, or, at least, that seems to have been thought to be true. The Chamber of Commerce of the city interested itself in the subject, and urged a remedy, in fear, probably, of the danger of reduction of the industry in connection with the airport, or in fear that it would not be expanded as expected. The Home Builders Company was seemingly organized in response to the interest thus manifested by the Chamber of Commerce. Eleven citizens were found who put up a certain amount of money

($2500, it seems, at that time). Among them was the Mayor of the city. There was evidently no thought at that time of dealing with the city, for the company attempted to obtain other lots, in close vicinity of the airport—where the officials of United Air Lines desired the new homes—but was unable to do so, and only requested to purchase the lots in question here thereafter. It was seemingly not deemed advisable to construct homes which would be too expensive for the employees of the airport to buy. All of these factors naturally enter into the question of the good faith of the parties, as well as into the question of what was a reasonable price for the lots here involved. We should bear in mind in this connection that the lots in question were held by the city in a proprietary capacity. Section 22-1902, R. S. 1931, which is a part of the original charter of the City of Cheyenne, provides that the city shall have the power "to purchase and hold real estate and personal property for the use of the city, to sell and convey any real or personal property, and to make such order respecting the same as may be conducive to the interests of the city." How far this provision is modified or controlled by Section 22-148, R. S. 1931, cited supra, need not be determined. But there can be no doubt that in any sale of property made by the city the council has the right to take into consideration its best economic, financial and industrial interests. In the case of Roberts v. Northern Pacific Railroad Co., 158 U. S. 1, 15 Sup. Ct. 761, 39 L. Ed. 879, a county had granted some of its property to the railroad company in aid of the construction of a railroad. No money had been paid. The county subsequently, evidently thinking that the grant to the railroad was a gift and therefore totally void, made a subsequent conveyance to another party, and the latter claimed to be the owner of the property. The court,

in discussing the respective rights of the parties, stated among other things as follows:

"It is, indeed, urged that the county authorities could only sell its lands for money. We do not accede to this proposition. If they possesesd the power to sell for money, we are pointed to no express provision of law that restricts them from selling for money's worth. Even upon such a narrow view it may well be contended that the consideration received by the county included a money payment. The deed recites the payment of money by the company to the county at the time of the conveyance, and it is a conceded fact that the lands, since they came into the possesion of the company, have yielded considerable sums as taxes to the county. It is straining no principle of law or of good sense to regard the payment of an annual tax an equivalent, for the purpose of our present inquiry, to the payment of a rent. The amount as well as the nature of the consideration received by the county in exchange for its lands, if it had the power to sell them, was a matter that concerned the county only."

In the case of Haesloop v. Charleston, 123 S. C. 272, 113 S. E. 596, the city agreed to convey to a private corporation certain property owned by it in its proprietary capacity, if the private corporation would erect upon the property a hotel of a certain value. The city received no money. Certain citizens and taxpayers sought to prevent the conveyance to the hotel company, claiming that a conveyance to the company would be a mere gift. The court, upholding the agreement, in its discussion states among other things the following:

"The right of the city council, under the powers conferred to sell this land to a private person or corporation for a private use for its market value in money * * * is unquestionable. * * * If, therefore, the city council has the right to dispose of this property for money's worth—that is, for a consideration of reasonably equivalent value in money—the next step in the inquiry is to determine the elements of value, with particular reference to direct and indirect benefits, the

council is entitled to consider in weighing and establishing the equivalent of a monetary consideration. * * * In determining what constitutes a consideration adequately equivalent in value to sustain a disposition of this property, we think it is clear that the city council are not limited to those elements of value that accrue, or are presumed to accrue, to a municipality from the appropriation of funds or property to such a 'public use' or 'public purpose' as would justify the exercise of the governmental powers of taxation or of eminent domain. * * * If in lieu of accepting in cash the market value of the property, to be turned into the public treasury and applied to current municipal expense or invested in other property or lent at interest, the city elects to receive the financial benefit of a permanent real estate improvement, which would reasonably tend to enhance the value of other municipal property, and from which it will derive by due operation of law an annual return in taxes upon an additional $1,000,000 of taxable property, can it be said that such consideration is of less value to the city even from a purely financial standpoint, than the consideration in cash suggested? * * * To the element of value just considered are to be added the other advantages to 'the city and its inhabitants,' which the council were entitled to evaluate in this connection, such as the benefit of needed facilities for caring for tourist travel, the quickening of the commercial life of the community reasonably to be anticipated from such a hotel as a channel of trade and commerce, and the distinctly public character of the service rendered by such a utility. * * * Since, therefore, the proposed grant of this real estate, held in a proprietary or quasi private capacity, under broad powers expressly conferring the right of discretionary disposal for the welfare and advantage of the city, is supported by a contractual consideration that reasonably secures to the city substantial returns in tax revenues and in other benefits having a clearly disclosed relation to the public good, we are of the opinion that it is not such a donation of public property to a private use in manifest abuse of the council's discretionary powers as will invalidate the conveyance authorized by the resolution of council."

As already stated, parties are interested in this case

who are not before the court. The proceedings in connection with the sale have proceeded beyond the stage of a mere executory contract. Conveyances have been made by the city, and the sum of $4150 has been paid to it which it still retains. It has been held that even though statutory provisions have not been complied with, a conveyance cannot be attacked collaterally. McQuillan, supra, Sec. 1254, and cases cited. In the case of Newbold v. Glenn, 67 Md. 489, 10 Atl. 242, a city sold and conveyed real property without advertising it as required by statute. It was held that notwithstanding the violation of the statute the sale was valid since it was sold for full value. In the case of Mayor, et al., v. Sonneborn, 113 N. Y. 423, 21 N. E. 121, a lessee from the city attempted to evade payment of the lease on the ground that the lease had not been made pursuant to public auction. The court said: "He has had the full benefit of the contract and, therefore, cannot be permitted, in an action founded upon it, to question its validity. The principle of estoppel upon which this rule stands has been recognized and applied in a uniform course of recent decisions by this court." If the city were to bring an equitable action to set aside the conveyances herein, it is clear that even though the situation had not been changed since the date of the first conveyance, the court would, when asked, require the city to pay back the sum received before revesting the city with title. It would be unjust and unconscionable that the city should, in a case of the character before us, receive back the lots and retain the money. Frick v. Brinkley, 61 Ark. 397; Hurwitz v. Moore, 132 App. Div. 29, 116 N. Y. S. 248; Sparks v. Jasper Co., 213 Mo. 218, 112 S. W. 265; second part of Tobin v. City Council of Sundance, 45 Wyo. 219, 17 P. (2d) 666. See also City of Fort Wayne v. Lake Shore & M. S. Ry. Co., (Ind.) 32 N. E. 215; Tucker v. Howard, 122 Mass. 529; People v. Brennan, 39 Barb.

522, 540. Counsel for appellants thinks otherwise. He contends that the city would have the right to retain the money in any event; that it could not be recovered from the city. His argument that the auction sale was invalid appears to be based mainly, or at least partially, on this theory—that, since the money could not be recovered, there was no consideration for the auction sale, and hence it must fall. Counsel's theory is faulty. He cites us to McQuillan, Munic. Corp. (2nd Ed.) p. 849, where the author states: "The general rule is that if a contract is within the corporate power of a municipality, but the contract is entered into without observing certain mandatory legal requirements specifically regulating the mode in which it is to be exercised, there can be no recovery thereunder." Obviously the text has no application herein. The author had in mind the *enforcement* of a contract, such, for instance, as was involved in the first part of Tobin v. City Council, supra. That may be readily gathered from the cases cited by the author—e.g., Twohy Bros. Co. v. Ochoco Irr. Dist., 108 Or. 1, 216 Pac. 189. There was no question of *enforcing* a contract involved at the time of the auction, nor is there at this time. The question now is whether a completed contract can be *dissolved*, and completed conveyances set aside without doing justice between the parties. We do not think so, even if the situation had not changed as in the case at bar.

But the situation has changed. It appears that buildings of the value of approximately $65,000 were erected before the commencement of this action. It is held that a city and the taxpayers may, under certain circumstances, be estopped when they sit by and permit large expenditures to be made pursuant to an invalid transaction. McQuillan, supra, sections 1254, 1261. But the parties to assert the estoppel are not before the court. Furthermore it appears that the buildings are occupied. Section 89-3908, Rev. St. 1931 provides,

in substance, among other things, that a party holding under a deed and who has received his title without collusion or fraud shall not be evicted from the property unless he has been paid for his improvements, provided, however, that the owner may elect to be paid for the value of the property without such improvement. It has been held that a void deed is a sufficient basis for the right under such a statute. Benton v. Realty Co., 161 Ia. 600, 143 N. W. 583; Nowler v. Coit, 1 Ohio 519; Flanigan v. Mathisen, 78 Nebr. 412, 110 N. W. 1012. In 31 C. J. 329 it is said that "it may be stated generally * * * that in the absence of a statute requiring a particular title, any species of title, legal or equitable, which is apparently good in form and which if valid would be sufficient to convey title to the land in question, ordinarily is sufficient to constitute color of title." In the case of Krause v. Means, 12 Kans. 335, it appears that a halfbreed Indian conveyed certain lands. He had no capacity to convey, and hence the deed was absolutely void. Later Congress gave him capacity to convey, and he conveyed to another grantee. It was held that the first grantee had the right of an occupying claimant under a statute similar to ours. In the case of Brown v. Nelms, 86 Ark. 368, 112 S. W. 373, an appraiser of property bought it at an administrator's sale. By reason of being such appraiser he was disqualified from purchasing. It was held, however, that though the deed to him was invalid, he had the right of an occupying claimant. There can be no doubt, in the case at bar, that the purchaser from the city, and the subsequent purchasers, all have acted in good faith and without actual fraud or collusion. No such fraud or collusion is, in fact, claimed herein, and it seems that counsel for appellants brought this action more for the purpose of calling the attention of officials in this state that they must not be interested in contracts with the city, than for any other reason,

evidently deeming it his duty, as a citizen of the state, to do so, even without reference to the outcome of this particular case. It would seem clear, accordingly, under the foregoing authorities, that the purchasers of the improved property herein would be entitled to the benefit of the occupying claimant law of this state. But they are not before the court to assert their rights. Section 89-3914, Rev. St. 1931, gives the real owner the right to choose whether he will pay for the improvements or whether he will tender a deed for the property and elect to receive payment for the vacant property. We are inclined to agree with counsel for appellants that the city has no right to "traffic" in houses. If that is correct, the only alternative which the city in the case at bar would have—if we should assume that the original purchase could be invalidated —would be to elect to take the value of the property, so improved. In other words, the title thereto would be good, leaving in the case at bar at most the question of whether the amount of $4150 already paid is sufficient. We might say, incidentally, that when at the sale at auction the city received a bid for $65,886.16 plus the amount of $4150 already received and then returned the $65,886.16, the city, in a round-about-way, merely recognized the rights given under the occupying claimant law.

Another and independent factor enters into the transactions with W. H. Andrew, Frank Yager and A. W. Harris, who bought separate properties at the last sale by the city heretofore mentioned. We do not know whether counsel claims that these sales should be held invalid. At least no direct claim to that effect is made. They bought at auction, as the statute provides, and there is no pretense that Mr. Allison was in any way connected with them, so that no illegality can be claimed at least on this account. Counsel contends generally that the auction sale was but an attempted ratification

of the first sale, and that no void sale can be ratified. We do not perceive the force of that contention. Simply because the city held a sale in August, 1935, which was not in compliance with the statute, can certainly be no reason why the city could not hold a sale in compliance with such statute subsequently. Nor do we know of any reason, and none has been pointed out, why the bidders at the first sale (let alone Andrew, Yager and Harris) could not be bidders at the second. The contention that there was no consideration for the auction sales is not well taken, as already pointed out. The city at that time had $4150 belonging to the purchasers. It retained that sum. It would have been an idle ceremony if the city had paid that sum to the Home Builders Company, only to be returned the next minute, and the consideration paid by Andrew, Yager and Harris was contained in that sum. There is no indication that these parties were not in perfectly good faith. It would seem that the most which could be said in connection with the sales to these parties would be that they were improvident, but there is at least a doubt, as already indicated, that taxpayers can bring any action on that account.

It is apparent, from what has been said, that the question of the original invalidity, in whole or in part, of the transactions above mentioned is to a more or less extent, if not entirely, relegated into the background, on account of the changed conditions since the time of the original sale in August, 1935. The Home Builders Company and the purchasers from it have certain rights which they might set up in any case which might be brought against them. We ought not to make any decision herein which would prejudice those rights. Section 89-2411, R. S. 1931, provides that "When declaratory relief is sought, all persons shall be made parties who have or claim any interest which would be affected by the declaration, and no

declaration shall prejudice the rights of persons not parties to the proceedings." In the case of City and County of Denver v. Denver Land Company, 85 Colo. 198, 274 Pac. 743, the controversy related to the creation of a storm sewer district and the assessment of property. Certain property-owners were not made parties to the action. The court said:

"The only parties before the court in this action are the defendant city, which has in contemplation the adoption of a public improvement, the cost of construction of which contemplates an assessment upon property therein on the area plan, and plaintiffs, owners of property within the district, and they are opposed to the area plan and favor the benefit plan which only, they say, is valid. The complaint itself alleges that there are many owners of property within the district who are in favor of the area plan. They are not parties to this action, and they would not be bound by any judgment we might render. To pronounce a declaratory judgment in this case, when parties who favor the area plan would not be bound thereby, would be not to save costs or time. To determine here which of the two plans should be adopted by the city would or might give rise to a flood of litigation, instituted by property owners within the district not parties to this proceeding who object to the benefit plan and insist upon the adoption of the area plan. Such a proceeding as this is unauthorized under the existing facts. Desireable as it might be to have an announcement of this court upon the question, it would be improper for us to decide it in the absence of the necessary parties."

In the case of the Southern Nebraska Power Co. v. Village of Deshler, 130 Nebr. 133, 264 N. W. 462, the court said:

"The Uniform Declaratory Judgments Act provides as follows: 'The court may refuse to render or enter a declaratory judgment or decree where such judgment or decree, if rendered or entered, would not terminate the uncertainty or controversy giving rise to the proceeding.' Comp. St. 1929, Sec. 20-21, 145. It is clear that the trial court in this case had no jurisdiction to

determine any controversy between the plaintiff and the members of the village board of Deshler, because the members of the board are not parties to this action. * * * Declaratory Judgments Act is applicable only where there is a present, actual controversy, and only where justiciable issues are presented and all interested persons are made parties to the proceeding. Therefore, this action cannot be maintained under the Uniform Declaratory Judgments Act, as all interested persons are not made parties."

Substantially the same principle has been announced in a number of other cases, all comparatively recent. Continental Mutual Ins. Co. v. Cochrane, 89 Colo. 462, 4 P. 2d) 308; Adams v. Slavin, 225 Ky. 135, 7 S. W. (2d) 836; Ex parte Hearst Committee, 245 Ky. 132, 53 S. W. 211; Perry v. City, 160 Tenn. 102, 22 S. W. (2d) 359; Cummings v. Shipp, 156 Tenn. 595, 3 S. W. (2d) 1062; Harrell v. Mortgage Co., 161 Tenn. 646, 32 S. W. (2d) 1023; 162 Tenn. 371, 36 S. W. (2d) 888; Wilcox v. Board of Commissioners, 262 Mich. 699, 247 N. W. 923 (rehearing denied in 262 Mich. 699, 249 N. W. 467); Jefferson County v. Fiscal Court, 259 Ky. 661, 83 S. W. 16; Ladner v. Siegel, 294 Pa. 368, 144 Atl. 274; Union Trust Co. v. Kaplan, 159 Misc. 1, 286 N. Y. S. 17; McDermott v. Bryer, 62 F. (2d) 297; Morton v. Construction Co., 36 Ariz. 97, 283 Pac. 281.

We think, as held in City & County of Denver v. Denver Land Company, supra, quoted above, that it would be improper for this court to make any announcement which would prejudice the rights of necessary parties absent herein. It remains, then, to consider as to what order we should make herein. On oral hearing, we asked counsel that question, but did not receive any answer, or satisfactory answer. Under Section 89-4820, R. S. 1931, a reversal in a case carries costs in favor of appellant. The latter, who have instituted this proceeding without bringing in the necessary parties, are clearly not entitled thereto. The only course, accord-

ingly, which we can properly pursue, is to send the case back to the district court with direction to dismiss it at the cost of the plaintiffs, and it is so ordered. The costs on this appeal will be assessed against appellants.

*Remanded with instructions.*

KIMBALL, J., concurs.

RINER, J., concurs in the result.